Filed 12/8/23  Mendez v. Tash CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| TOMAS MENDEZ et al., | B326232 |
| Plaintiffs and Appellants, | |
| v. | (Los Angeles County Super. Ct. No. 21STCV16759) |
| RAYMOND M. TASH et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Elihu M. Berle, Judge.  Affirmed.

Catanzarite Law Corporation, Kenneth J. Catanzarite for Plaintiffs and Appellants.

Neufeld Marks, Paul S. Marks for Defendants and Respondents.

_____

The California Dental Board (Dental Board) authorized a partially disabled dentist to perform only limited procedures. In a putative class action, two patients sued the dentist for battery, alleging he performed unauthorized procedures. Plaintiffs moved for class certification, offering an expert's opinion that liability could be established with common evidence, defendant's own billing records, which showed he performed unauthorized procedures. Defendant countered with an expert who explained the billing records showed only that defendant supervised the practice of other dentists, not that he performed any procedures himself. The trial court found that plaintiffs failed to establish that class claims presented common questions of law and fact or that class treatment would be superior to individual litigation, and therefore denied certification.

Plaintiffs argue that denial of certification was improper because in finding lack of commonality the court relied on inadmissible evidence and an improper legal assumption. We disagree, and therefore affirm.

## BACKGROUND

### A. Complaint

Raymond M. Tash, D.D.S. and Raymond M. Tash, D.D.S., A Professional Corporation (Tash APC), operated a dental practice in Lynwood doing business under the name St. Tomas Dentistry. Tash also operated another practice in Huntington Park.

In 2013, Tash, who was partially disabled, entered into a stipulated settlement and disciplinary order with the Dental Board whereby his dental practice was to exclude "hands-on" dental work, which was defined as "treatment, by surgery or other method, of diseases and lesions, or the correction of malposition of teeth or associated structures." Tash was

2

permitted to perform other dental work such as examination and cleaning.

In 2019, Tash sold his Lynwood practice to Sung Lee, D.M.D.

In 2022, Tomas and Dulce Mendez commenced this action on behalf of themselves and a putative class contesting the practice of Tash and Tash APC of performing dental procedures prohibited by the Dental Board.  In their first amended complaint, plaintiffs assert causes of action on a class basis for violation of Business and Professions Code section 17200 et seq., unjust enrichment, battery (lack of informed consent), and breach of fiduciary duty, seeking actual and punitive damages and declaratory relief.  (Plaintiffs also assert individual claims for professional negligence, constructive fraud, and fraudulent concealment.)

The Mendezes allege Tash concealed the Dental Board practice restriction and unlawfully charged patients and consumers for dental services he was unauthorized to perform.

## B.    Class Certification

The Mendezes moved to certify a class of all persons for whom Tash performed hands-on dental work within four years prior to the complaint, which they estimated to be around 500 individuals.

The certification motion went through three rounds of briefing, the court ultimately finding the class was sufficiently ascertainable and numerous and the plaintiffs presented claims typical of the class and could adequately represent it.  These findings are uncontested on appeal.  The issues on appeal are whether common questions of law and fact predominate and

3

whether class treatment would be superior to individualized litigation.

**1.    Motion**

On these two issues the Mendezes at first argued they could prove the class claims based on their own personal observations of Tash's practice while they were his patients.  The trial court found this theory "strained credulity," and the Mendezes have since abandoned it.  We will therefore discuss only their second theory.

As a second theory, the Mendezes argued that class claims could be proven using common evidence: Tash's billing and practice records.

In support of the argument, the Mendezes and Celma Ascencio, another Tash patient, declared that Tash treated them with "hands-on" dental work, which they defined as dental services performed with "gloved fingers" in their mouths.

Also in support, Lou Manolescu, an expert on dental practice operations and billing practices, declared that she reviewed patient records and electronic files from Tash's Lynwood practice which were now in the possession of Dr. Lee.  The electronic files and billing records were originated and maintained on a practice management software system called Soft Dent, and included historical contemporaneous entries at the time of treatment that reflected dental work performed and related billings.

Manolescu declared that Tash, identified by his National Provider Identifier (NPI), billed and collected as the " 'Treatment Dentist' Doctor Number 1" for services that required hands-on dentistry.  Other doctors worked at the practice, each with a separate NPI.  Manolescu declared, "they did bill as well," but

4

their production was "far lower than what Dr. Tash billed," and none treated the Mendezes or Ascencio.

Manolescu declared that she queried Soft Dent to determine the total number of patients "seen by Dr. Tash as doctor 1," and was able to generate "production records for amounts billed for the work of Dr. 1 that tied to Dr. Tash." "As a result," Manolescu declared, "historical billings [and] entries . . . reflected [that] Dr. Tash as Treating Dentist did the work and billed as the dentist who provided the treatment."

Manolescu supported her declaration with 17 exhibits:

### a.     Exhibits 1 and 2:  Qualifications

Exhibit 1 was Manolescu's curriculum vitae.  Exhibit 2 was a printout of a search result from a federal Medicare/Medicaid Web site indicating NPI was 1609918705.

### b.     Exhibit 3:  American Dental Association (ADA) Dental Claim Form

Exhibit 3 purported to be a claim form submitted to Blue Cross of California for root canal therapy performed on Ascencio. Box 48 of the form identified "St. Tomas Dentistry" as the billing entity.  Box 53 stated, "I hereby certify that the procedures as indicated . . . have been completed."  The signature line stated, "Signature on File."  Underneath this line the form stated, "Signed (Treating Dentist)," and next to this someone had typed "Raymond M. Tash, DDS."  Box 54 gave Tash's NPI, 1609918705.

Manolescu confirmed this work was billed by "Doctor 1" in Tash's Soft Dent software, and declared that "electronic files with Dr. Tash as the Treating Dentist for [Ascencio]" existed for the years 2016, 2017, and 2018.

5

### c. Exhibits 4-7: Annual Production and Income

Exhibits 4 through 7 were tables, apparently created by Manolescu or pulled from Soft Dent, showing that an unidentified entity made roughly $400,000 each year from 2016 to 2019. Manolescu represented that this entity was Tash's dental practice.

### d. Exhibits 8-11: Procedures by Code

Exhibits 8 through 11, titled "Procedures by Procedure Code: Tash," were tables, again apparently created by Manolescu, showing that an unidentified entity performed dozens of hands-on procedures each year from 2016 to 2019. Manolescu represented that Tash was the "treating" dentist.

### e. Exhibits 12-17: Procedure and Payment Histories

Exhibits 12 through 17 were tables, prepared by Manolescu, listing procedures performed on the Mendezes and Ascencio. In a column titled "Treat Dr," the entries were all "Tash" or "Unknown."

### 2. Opposition

In opposition to the certification motion, Tash declared the Mendez and Ascencio declarations were "whole cloth" fabrications. Even if he had not been warned by his disability insurer that his practice would be monitored for unauthorized activity, he had trouble even holding a glass of water or buttoning his shirt, much less practicing hands-on dentistry. Instead, he managed the office, hired and supervised "a minimum of ten other dentists" working for him, checked their work, and oversaw billing.

6

In support of Tash's opposition, Kathleen Johnson, a dental practice consultant, contested Manolescu's central proposition that financial records from Dr. Tash's former practice offered common proof that Tash provided hands-on treatment. Johnson declared that she "interpret[ed] the gist of Ms. Manolescu's declaration to be that, upon her review of a limited [number] of financial documents relating to Dr. Tash's former practice, it was Dr. Tash alone who provided services to the various patients in his practice, and there were no other practitioners who treated patients."

First, Johnson declared that she personally observed Tash's former practice over the "better part of a full day" at the behest of a client who was interested in buying the practice. She was provided detailed financial documentation, was given access to employees on the premises, and watched the "associate-driven" practice as it was being run. She saw an associate dentist practice hands-on dentistry but never saw Tash do so. Johnson declared that "based on the information [she] reviewed, based on [her] own personal observations, and based on the communications [she] had with Dr. Tash, his former staff, and his counsel," her "professional opinion [was] that Ms. Manolescu's opinion [was] unsupported."

Johnson explained it was standard practice in the dental industry for a dental corporation's contract with an insurance company to be under the corporation's name, as occurred with Tash's practice. This resulted in the corporation becoming the billing entity and Tash being considered the contracted provider. This was standard because associate dentists would not then be liable for income tax, and payments from insurance companies and Denti-Cal, Medi-Cal's dental program, would not need to be

7

routed first to providers, who must then remit them to the practice.

Johnson explained that every practitioner had an individual NPI number but that did not mean the person identified in the billing either by that number or as "Doctor No. 1" conducted hands-on dentistry. In other words, that "Doctor No. 1 was the only billing doctor on the practice," and billed under Tash's NPI number, did not mean he performed the dentistry himself, just that he billed for it.

Johnson explained that the associate dentists "were in the system not as billing entities but as the treatment providers," which allowed Tash to track their performance and, for example, base any bonuses on their production.

Johnson explained that "[e]very dental software program has the ability to break down procedures performed by code and payments toward those procedures. However, all this shows is that the practice was a general practice and was generating income by performing all aspects of general dentistry." Such records had "nothing to do with who performed the work, as this practice was established as an associate-run practice. It would seem unusual for Dr. Tash to have paid for associate dentists, if he himself were doing all the treatments—which is what Ms. Manolescu is implying (if not outright stating)."

### 3. Ruling

As noted above, the trial court found the class was sufficiently ascertainable and numerous and the plaintiffs presented typical claims and could adequately represent the class. The court also found the Mendezes could not prove class claims based on their own personal observations of Tash's

practice while in the office. None of these findings is contested on appeal.

Plaintiffs contest only the court's reliance on Johnson's opinion.

In this respect, the court found that as Johnson explained, Manolescu made a "leap in logic" by stating Tash's practice of billing as Doctor No. 1 showed he actually performed hands-on dentistry, and "fail[ed] to fill in missing gaps" between Tash's billing and treatment practices.

The court found that "[w]ithout Plaintiffs being able to show what common evidence would be set forth to establish Dr. Tash performing hands-on dentistry on a class-wide basis (not just billing entries which would be the same whether he performed the services or whether an associate did), all that can be deduced is that each class member would need to testify as to 'whether Dr. Tash in fact performed any services on the person; what services were performed; and then, what damages were suffered.' "

Even if billing records could indicate *some* aspect of classwide evidence, the court found, each contact may or may not have involved hands-on dentistry, and plaintiffs offered no viable option for determining which did and which did not. The court found, "To determine whether the services provided would fit the Dental Board's definition would, no doubt, require individualized inquiry into the medical records of patients and/or their testimony as to what services were actually provided and by whom. Additionally, the class members would need to testify as to what injury, if any, was incurred."

Regardless of the nature of dental billing, the court found, plaintiffs' causes of action for battery, lack of informed consent,

9

and breach of fiduciary duty would require inquiries into what information was known to individual patients and what consent was given.

The court therefore concluded that plaintiffs failed to show that common questions of fact and law would predominate over individualized ones.

Given that the plaintiffs failed to establish predominant common questions, the court found that manageability became a concern, yet plaintiffs offered no case plan by which litigation could avoid devolving into hundreds of mini-trials.  The court therefore found that given the number of class members and significant amounts at issue—an average of $3,000 per patient—class management offered no benefit over litigating the matter individually.

Therefore, the court denied certification.

Plaintiffs appeal.

## DISCUSSION

Plaintiffs contend the Johnson opinion was inadmissible and the court ignored their theory of recovery.

## A.     Standard of Review

Code of Civil Procedure section 382 authorizes a suit to be tried as a class action "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court."  Class certification requires demonstration of an ascertainable and sufficiently numerous class, a well-defined community of interest, and the superiority of proceeding as a class.  (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021 (*Brinker*).)

10

The "community of interest" requirement has three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class. (*Brinker, supra*, 53 Cal.4th at p. 1021; *Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 529-530 (*Ayala*).) Generally, " 'if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.' " (*Brinker*, at p. 1022; *Cochran v. Schwan's Home Service, Inc.* (2014) 228 Cal.App.4th 1137, 1142 (*Cochran*).)

In reviewing a trial court's denial of class certification, we examine "whether the operative legal principles, as applied to the facts of the case, render the claims susceptible to resolution on a common basis." (*Ayala, supra*, 59 Cal.4th at p. 530; *Brinker, supra*, 53 Cal.4th at pp. 1023-1025.) " 'The certification question is "essentially a procedural one that does not ask whether an action is legally or factually meritorious." ' " (*Brinker,* at p. 1023.) Courts focus instead on what type of questions—common or individual—are likely to arise, and whether proceeding as a class action, as compared to other forms of action, is a superior method of resolving these questions. (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 327, 339 & fn. 10 (*Sav-On*).)

"Although predominance of common issues is often a major factor in a certification analysis, it is not the only consideration. In certifying a class action, the court must also conclude that litigation of individual issues, including those arising from affirmative defenses, can be managed fairly and efficiently. [Citation.] '[W]hether in a given case affirmative defenses should

11

lead a court to approve or reject certification will hinge on the manageability of any individual issues.' " (*Duran v. U.S. Bank Assn.* (2014) 59 Cal.4th 1, 28-29.) " 'Individual issues do not render class certification inappropriate *so long as* such issues may effectively be managed.' " (*Id.* at p. 29.) "Trial courts must pay careful attention to manageability when deciding whether to certify a class action. In considering whether a class action is a superior device for resolving a controversy, the manageability of individual issues is just as important as the existence of common questions uniting the proposed class. If the court makes a reasoned, informed decision about manageability at the certification stage, the litigants can plan accordingly and the court will have less need to intervene later to control the proceedings." (*Ibid.*)

"We review the trial court's ruling for abuse of discretion and generally will not disturb it, ' "unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions." ' " (*Ayala, supra*, 59 Cal.4th at p. 530.) If the court's "reasons for granting or denying certification . . . are erroneous, we must reverse, whether or not other reasons [could have been] relied upon [to] support[] the ruling." (*Ibid.*; *Cochran, supra*, 228 Cal.App.4th at p. 1143.) In this respect, " 'appellate review of orders denying class certification differs from ordinary appellate review. Under ordinary appellate review, we do not address the trial court's reasoning and consider only whether the result was correct. [Citation.] But when denying class certification, the trial court must state its reasons, and we must review those reasons for correctness. [Citation.] We may only consider the reasons stated by the trial court and must ignore any unexpressed reason that

might support the ruling.' " (*Cochran,* at p. 1143.) "In other words, we review only the reasons given by the trial court for denial of class certification, and ignore any other grounds that might support denial." (*Bartold v. Glendale Federal Bank* (2000) 81 Cal.App.4th 816, 829, overturned on other grounds due to Legislative Action in 2001 Cal. Legis. Serv. Ch. 560.)

Because trial courts " 'are ideally situated to evaluate the efficiencies and practicalities of permitting group action,' " they are " 'afforded great discretion' " in evaluating the relevant factors and ruling on a class certification motion. (*Sav-On, supra*, 34 Cal.4th at p. 326.)

## B. The Court's Denial of Certification Was Supported by Substantial, Admissible Evidence

Plaintiffs argue that Johnson's opinion contesting Manolescu's opinion was inadmissible. We disagree.

A "court may consider only *admissible* expert opinion evidence at class certification." (*Apple Inc. v. Superior Court* (2018) 19 Cal.App.5th 1101, 1117 (*Apple*).) "The reasons for such a limitation are obvious. A trial court cannot make an informed or reliable determination on the basis of inadmissible expert opinion evidence. And certifying a proposed class based on inadmissible expert opinion evidence would merely lead to its exclusion at trial, imperiling continued certification of the class and wasting the time and resources of the parties and the court." (*Ibid*.)

We review the admissibility of evidence de novo. (*Apple, supra*, 19 Cal.App.5th at p. 1117.)

"If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common

13

experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion." (Evid. Code, § 801.) An opinion based in whole or in part on an improper matter may be excluded. (*Id.*, § 803.)

"[U]nder Evidence Code sections 801, subdivision (b), and 802, the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771-772 (*Sargon*).) "This means that a court may inquire into, not only the type of material on which an expert relies, but also whether that material actually supports the expert's reasoning. 'A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.' " (*Id.* at p. 771.)

In considering the expert evidence, a "trial court must examine the type of material on which an expert relies, whether that material actually supports the expert's reasoning, and whether the expert's methodology is sound." (*Apple*, *supra*, 19 Cal.App.5th at p. 1125.) " '[T]he expert's opinion may not be based "on assumptions of fact without evidentiary support." ' " (*Sargon*, *supra*, 55 Cal.4th at p. 770.)

14

Here, Johnson opined that Manolescu's central proposition, that Dr. Tash's financial records offered common proof that he provided hands-on dentistry, was unsupported. She based this opinion on the information she reviewed about Tash's practice, her own personal observations, and communications she had with Dr. Tash, his former staff, and his counsel. This is the sort of matter on which an expert may rely. (Evid. Code, § 801, subd. (b) [expert opinion may be based on matter "perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert"].) Johnson's opinion was therefore admissible.

Noting that Johnson interpreted the gist of Manolescu's opinion to be that only Tash provided dental services, plaintiffs argue this constitutes an assumption that is inadmissible because it is unsupported by the evidence.

First, Johnson's interpretation of Manolescu's position is not an assumption but at most a mischaracterization. One expert's mischaracterization of another's position does not render the first expert's opinion inadmissible, merely unpersuasive.

In any event, Johnson stated only that "the gist" of Manolescu's declaration was that Tash alone provided services, and qualified that this was "what Ms. Manolescu [was] implying (if not outright stating)."

This is a fair characterization. Tash, Manolescu and Johnson noted the participation of associate dentists. Tash declared that "a minimum of 10" associates worked at the practice. Johnson declared the practice was "associate-driven." And Manolescu acknowledged that other dentists worked there.

15

But Manolescu's declaration is virtually silent as to the associates' contributions. She declared only that the associate dentists "did bill as well," but their production was "far lower than what Dr. Tash billed," and none treated the Mendezes or Ascencio.

It is therefore fair to say that the gist of Manolescu's opinion, and the clear implication, was that only Tash provided services.

Plaintiffs argue that Johnson's mischaracterization of Manolescu's opinion "permeates and drives her remaining opinions" that Manolescu's production numbers pertained only to Tash. But they admit Manolescu's numbers *did* pertain only to Tash. We fail to see the error in Johnson claiming something that plaintiffs readily admit.

Plaintiffs argue Johnson's opinions are inadmissible because they are based upon matters which are not reasonably comparable. (See *Sargon*, *supra*, 55 Cal.4th at p. 770 [expert may not base opinion upon a comparison if the matters compared are not reasonably comparable].) This is so, they argue, because Johnson "focuses on" a billing dentist to challenge Manolescu's conclusion that Tash was the treating dentist.

Johnson's opinion had nothing to do with any comparison between a billing and a treating dentist, she *distinguished* them to challenge Manolescu's opinion that Doctor Number 1, the billing dentist, was also the treating dentist.

We assume Manolescu meant to demonstrate that Tash's activities could be distinguished from those of the associate dentists by selective billing queries made of the Soft Dent software, and in this manner class claims could be demonstrated by easily obtained common proof. But Manolescu showed no such

16

selection taking place—she referenced *only* Tash's billings. It is therefore at least conceivable that selective *billing* queries would not have provided common proof of Tash's *treatment* activities because a significant portion of work done by the associate dentists fell under Tash's "Doctor Number 1" moniker in the billing. Indeed, Manolescu hinted as much when she declared that Tash billed far more than the other dentists.

This was exactly Johnson's opinion, which the trial court was entitled to credit.

Plaintiffs argue that a community of interest and superiority of class treatment were supported by substantial evidence. But our review is to determine whether substantial evidence supported the trial court's ruling, not whether it supported a ruling the court did not make.

## C.     The Court Considered Plaintiffs' Theory of Recovery

Plaintiffs argue the trial court relied on an erroneous legal assumption by ignoring their theory of recovery. They argue their theory is that Tash failed to disclose his disability and therefore performed unauthorized dentistry without providing informed consent. They argue that "contrary to the court's characterization," they are not seeking damages on a class basis for injuries sustained because Tash rendered treatment below the standard of care.

To support the argument, plaintiffs cite one sentence from the court's order denying certification: "Additionally, the class members would need to testify as to what injury, if any, was incurred."

We read this statement, which comes at the end of a discussion about what proof would establish that hands-on dentistry occurred, simply as describing the final element of

17

plaintiffs' informed consent claim, not reflecting an assumption that plaintiffs claim personal injury caused by professional negligence.

## DISPOSITION

The judgment is affirmed. Respondents are to recover their costs on appeal.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.